**AFFIRMED and Opinion Filed December 21, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01167-CV

## IN THE ESTATE OF MELISSA WAGNER OSBORNE, DECEASED

**On Appeal from the Collin County Probate**
**Collin County, Texas**
**Trial Court Cause No. PB1-1506-2016**

## MEMORANDUM OPINION
Before Justices Francis, Schenck, and Richter[1]
Opinion by Justice Richter

This appeal involves a will contest. Appellant Joann Rubio was the caretaker for Melissa Wagner Osborne, the deceased, and appellee Joseph Edward Osborne, Jr. was Melissa's husband at the time of her death. The will stated Melissa was bequeathing her house and all her personal property to appellant, who offered the will for probate. A jury determined Melissa lacked testamentary capacity to sign the will, and the trial court issued a final judgment that denied the will's admission to probate. In a single issue, appellant contends the evidence is legally and factually insufficient to support the jury's finding that Melissa lacked testamentary capacity. We affirm the trial court's final judgment.

---

[1] The Hon. Martin Richter, Justice, Assigned

BACKGROUND

Melissa and Joseph were married in 1973. Joseph, who was in the rock band Lynyrd Skynyrd, survived a plane crash in 1977 that killed several bandmates. Joseph and Melissa built their house in McKinney in 1987. Although they divorced in 2002, Joseph continued living in the home with Melissa. Appellant became Melissa's caregiver on a part-time basis in 2013. In January, 2014, appellant began taking care of Melissa's needs full time. On February 24, 2014, Melissa wrote out a will that stated she wanted to leave her house, furnishings, and personal property to appellant. The will was signed and witnessed the next day, February 25, 2014.

Melissa died on September 14, 2016. After Melissa's death, appellant filed an application to probate the will and for issuance of letters of independent administration. Joseph filed his opposition to probate of the will and an application to determine heirship, alleging that he and Melissa continually lived as husband and wife after their divorce and, thus, he was entitled to 100% of Melissa's property. Appellant filed a motion for no-evidence summary judgment. The trial court denied appellant's motion for no-evidence summary judgment and proceeded with a jury trial in June, 2017.

*Evidence Presented*

Appellant testified she was employed by Outreach Health Services and met Melissa in January 2013 when she began as a part-time caregiver. Appellant became Melissa's full-time caregiver in January 2014. Appellant provided care to Melissa from Monday through Friday. She testified she also spent other times with Melissa, including going out to eat, getting together on the weekends, and celebrating birthdays and holidays together. Appellant testified that although Melissa had several physical ailments, she did not believe Melissa had any mental or psychological impairment. Appellant acknowledged that Joseph lived in the home with Melissa, but insisted he stayed "on the other side of the house" while Melissa stayed in the master bedroom.

Appellant testified that about two weeks before Melissa wrote out the will, Melissa stated that she was giving her estate to appellant because "she did not want Joseph to have it." According to appellant, Melissa fully understood she was disposing of her property through the will upon her death. The day after Melissa wrote out her will, appellant took Melissa to a bail bond company to get the will notarized "so everything would be legal." Appellant testified at no time while caring for Melissa did she think Melissa was mentally incapacitated or unable to make judgment calls or decisions.

On cross-examination, appellant testified she began working full time with Melissa on January 13, 2014 because Maria Vasquez, the previous caregiver, had left. Appellant admitted the will was written and signed one month after she began working full-time for Melissa, and she acknowledged that a previous will executed in 2008 that left Melissa's house and all of Melissa's property to the previous caregiver, Maria Vasquez, was being voided by the February 2014 will. Appellant testified Melissa took several daily medications, but she insisted that at no time was Melissa mentally incapacitated.

Lindsey Pendleton, a licensed vocational nurse in Melissa's physician's office, testified Melissa had an "intracutaneous fistula" on her stomach that resulted in her having to have a colostomy bag. Some days Melissa could walk and other days she would be in a wheelchair. Pendleton testified Melissa was always in "good spirits" whenever she came to the doctor's office, which was every few months, and usually appellant was with her. Pendleton testified Joseph brought Melissa to the doctor's office "a few times." Pendleton said she was not aware of any mental, psychological, or psychiatric problems affecting Melissa. Pendleton testified she believed that in 2014, the decedent had sufficient mental ability to understand she was making a will and the property she possessed.

On cross-examination, Pendleton testified Melissa took narcotic drugs for pain management, including Oxycontin, Hydrocodone, Xanax, and Prozac. Pendleton said that when she began as a nurse in the doctor's office, she would characterize Melissa as being "very sick, she had her good days and bad days, but her diagnoses remained the same until her death." Pendleton testified Melissa's illnesses included Type 2 diabetes, cancer, Cushing's disease, hernia repair surgery, abdominal hysterectomy surgery, gastric bypass surgery, as well as obesity. Pendleton did not know what specific drugs Melissa was taking in February 2014 when the will was written and signed, but she believed that none of Melissa's physical ailments impaired her ability to make decisions. Pendleton also testified that after Melissa's death, appellant became a regular patient with Melissa's doctor.

Victoria Bean testified she had known Melissa for over thirty years and visited with her at least twice a month. Bean said that most of Melissa's life centered on her medical care, and that Melissa was "very ill and suffering." Bean testified Melissa was "strong-willed," "mentally sharp," "knew the extent of her property," and had "sufficient mental ability to make her will." Bean testified Melissa told her about the will and stated that appellant was the beneficiary of her estate and she wanted appellant to get all of her property.

On cross-examination, Bean testified she knew Melissa's 2008 will had a different caretaker listed as the beneficiary of Melissa's house and personal property. Bean said she and appellant wrote out Melissa's obituary that stated appellant and appellant's family was Melissa's "adopted family." Bean further testified that after Melissa's death, she went to the house to see Joseph, who told her that he was having some financial difficulties. Bean offered to buy two of Joseph's gold records he had received as member of Lynyrd Skynyrd. She gave Joseph $400 for the two records.

Joseph testified he and Melissa divorced only because they had monetary problems and she needed to "get her insurance." After the divorce, he continued living in the home and they resumed as "husband and wife." Joseph testified Melissa "took a lot of medication" and "that had an effect on her thinking." Joseph said it "was possible" that Melissa lacked mental capacity to draft a will in 2014. Joseph further testified Melissa had a history of "kidney cancer, Grave's disease, diabetes, and hypertension," and she took "some psychiatric medicines" for anxiety and antidepressants that included Xanax, Prozac, and Oxycontin.

After deliberation, the jury rendered the following verdict: (1) Melissa did not have testamentary capacity to sign the document dated February 24, 2014 and February 25, 2014; (2) the document dated February 24, 2014 and February 25, 2014 was wholly in Melissa's handwriting and signed by her; (3) Melissa did not sign the document as a result of undue influence; (4) Melissa did not sign the document as a result of fraud; and (5) Melissa and Joseph were informally married after the date of their divorce. On June 29, 2017, the trial court issued its Final Judgment that stated that the jury found in favor of Joseph and against appellant, that Melissa died intestate, that Joseph was the surviving spouse of Melissa, and that the will was denied admission to probate. Appellant then moved to disregard the jury findings and modify the judgment or, alternatively, a moved for new trial. The trial court denied the motion for new trial. Subsequently, this Court was notified that appellee Joseph Edward Osborne, Jr. died of natural causes on April 9, 2018.

ISSUE

In a single issue, appellant contends the evidence is legally and factually insufficient to support the jury's finding that Melissa lacked testamentary capacity. Appellant asserts she provided competent evidence to establish that Melissa possessed testamentary capacity when she executed her will. Appellant argues that although Melissa had physical ailments and took

medications, those facts do not prove a lack of testamentary capacity at the time Melissa wrote out and signed her will.

APPLICABLE LAW

As the proponent of the February 2014 will, appellant had the burden to prove that Melissa had testamentary capacity on February 24, 2014 and February 25, 2014. *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983). When a party attacks the legal sufficiency of an adverse finding on an issue for which she had the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Id*. at 58; *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). Under the requisite two-prong analysis, the reviewing court must first examine the record for evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *Dow Chemical*, 46 S.W.3d at 241. If there is no evidence to support the finding, then the entire record must be examined to determine if the contrary proposition is established as a matter of law. *Dow Chemical*, 46 S.W.3d at 241. The reviewing court must assume the jury credited any testimony favorable to its verdict, and disbelieved any contrary testimony, if a reasonable person would do so. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Croucher*, 660 S.W.2d at 58; *Dow Chemical*, 46 S.W.3d at 242. The reviewing court considers and weighs all of the evidence to determine whether the evidence is so weak or the finding is "so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Dow Chemical*, 46 S.W.3d at 242; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003). It is exclusively within the

jury's province to resolve conflicts in the evidence and to determine the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle*, 116 S.W.3d at 761.

A testator has testamentary capacity when she has sufficient mental ability to understand she is making a will, the effect of making a will, and the general nature and extent of her property. *In re Estate of Blakes*, 104 S.W.3d 333, 336 (Tex. App.—Dallas 2003, no pet.). In a will contest, the pivotal issue is whether the testator had testamentary capacity on the day the will was executed. *Id*. However, evidence of the testator's state of mind at other times can be used to prove her state of mind on the day the will was executed provided the evidence demonstrates a condition affecting her testamentary capacity was persistent and likely present at the time the will was executed. *Id*.

## DISCUSSION

The jury heard testimony from several witnesses who said they believed Melissa had testamentary capacity at the time she wrote out and signed her will. Appellant said Melissa never showed any signs of mental incapacity for the three years she cared for her. Bean, who was Melissa's friend of thirty years, said Melissa was a "strong-willed person" and was "mentally sharp" the entire time she knew her. And Pendleton, the nurse in Melissa's doctor's office, said Melissa "at no time" showed any type mental incapacity. Both appellant and Pendleton acknowledged that Melissa had numerous illnesses, surgeries, and took narcotic medications. However, they both insisted that none of Melissa's ailments or medications impaired her ability to make decisions.

The jury also heard Joseph's testimony that he believed it "was possible" that the "psychiatric medications" Melissa took "had an effect on her thinking." Medical records admitted into evidence spanning from 2007 to 2016 detailed many of Melissa's ailments. While Pendleton could not say what drugs Melissa was taking in February 2014, she did testify about Melissa's

many ailments and that Melissa was "very sick." Both appellant and Joseph said the drugs Melissa was consistently taking included Oxycontin, Xanax, Prozac, and Hydrocodone.

It is the jury's exclusive province to determine the credibility of the witnesses and the weight to be given their testimony, and we do not substitute our judgment for that of the jury. *See Bright v. Addison*, 171 S.W.3d 588, 595–96 (Tex. App.—Dallas 2005, pet. dism'd). A reasonable jury could have determined that the types of drugs taken by Melissa were powerful enough to alter a person's mental capacity. A reasonable jury could have determined Melissa lacked testamentary capacity in light of the fact that she had issued a 2008 will leaving all her property to her previous caregiver, Maria Vasquez. A reasonable jury could have disbelieved appellant's testimony given the fact that one month after appellant began working fulltime for Melissa, Melissa wrote out a new will that voided the 2008 will. Moreover, the jury received evidence that showed appellant listed herself as Melissa's daughter, although she was not related to Melissa in any way, on the death certificate of Melissa and on the order for cremation of Melissa. Appellant also set up a "GoFundMe" page on the internet that stated she had lost her "best friend/mom."

The jury also could have reasonably discounted Pendleton's testimony because appellant was currently a patient with Melissa's doctor, where Pendleton was employed. Likewise, the jury could have reasonably discounted Bean's testimony because Bean helped appellant write Melissa's obituary that named appellant and appellant's family as Melissa's "adopted family." *See City of Keller*, 168 S.W.3d at 819; *Golden Eagle*, 116 S.W.3d at 761.

We conclude the jury's findings that Melissa lacked the testamentary capacity at the time the will was written and signed is not against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Golden Eagle*, 116 S.W.3d at 761, *Croucher*, 660 S.W.2d at 57. We further conclude the evidence is both legally and factually sufficient to support the

jury's finding that Melissa lacked testamentary capacity at the time the will was written and signed.

*See Golden Eagle*, 116 S.W.3d at 761; *Dow Chemical*, 46 S.W.3d at 241–42.

We affirm the trial court's final judgment.


/Martin Richter/
MARTIN RICHTER
JUSTICE, ASSIGNED

171167F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE ESTATE OF MELISSA
WAGNER OSBORNE, DECEASED

No. 05-17-01167-CV

On Appeal from the Collin County Probate,
Collin County, Texas
Trial Court Cause No. PB1-1506-2016.
Opinion delivered by Justice Richter.
Justices Francis and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Joseph Edward Osborne, Jr. recover his costs of this appeal from appellant Joann Rubio.

Judgment entered December 21, 2018.